SEYFARTH SHAW LLP
Diana Tabacopoulos (SBN 128238)
Regina A. Musolino (SBN 198872)
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile:  (310) 201-5219
dtabacopoulos@seyfarth.com
rmusolino@seyfarth.com

SEYFARTH SHAW LLP
Jill A. Martin (SBN 245626)
333 South Hope Street, Suite 3900
Los Angeles, CA 90071
Telephone:  (213) 270-9600
Facsimile:   (213) 270-9601
jamartin@seyfarth.com

Attorneys for Defendants
HSBC Finance Corporation and Beneficial Company LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL VELASQUEZ, FAVIOLA ALVAREZ, MARCELO ALTAMIRANO, JACKEY WILSON II, CARLOS MARTINEZ AND DIONICIO MARTINEZ, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HSBC FINANCE CORPORATION, HOUSEHOLD FINANCE CORPORATION, and BENEFICIAL COMPANY LLC<br><br>Defendants. | Case No. C08-04592 SC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**<br><br>(*Appendix of Evidence; Evidentiary Objections; Motion to Strike and Proposed Orders filed concurrently*)<br><br>Date:   February 5, 2010<br>Time:   10:00 a.m.<br>Judge:  Hon. Samuel Conti<br>Courtroom: 1 |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................3

    A.    Overview ..................................................................................3

    B.    Defendants' Timekeeping Polices Prohibited Unpaid Work ........................4

        1. Defendants' Policies and Training ............................................4

        2. Enforcement Of Policies ........................................................7

    C.    Compensation Policies Did Not Incentivize Unpaid Work ........................8

        1. Management Pay Did Not Incentivize Unpaid Work ..............................9

        2. Account Executive Sales Quotas Did Not Incentivize Unpaid Work ........................................................11

    D.    Litigation History ..................................................................13

ARGUMENT AND AUTHORITIES .................................................................14

    A.    Plaintiffs' Case Theory Prevents Them From Meeting Their Burden of Showing That They And The Putative Class Are Similarly Situated ......14

        1. No Single Decision, Plan, Or Policy Exists ............................14

        2. Plaintiffs' Reliance on Defendants' Enforcement Efforts Is Misplaced ........................................................15

        3. Because Plaintiffs Cannot Identify A Single Plan Or Policy, They Cannot Demonstrate That They Are Similarly Situated ................17

    B.    Potential Plaintiffs' Claims Would Require Individualized Inquiry ............17

        1. Each Claim Would Require An Individualized Inquiry ........................17

        2. Each Potential Plaintiff's Claim Would Require An Individualized Inquiry Regarding Supervisors ........................................18

        3. Each Putative Class Member Is Subject to Different Defenses ..............20

    C.    Fairness and Procedural Considerations Make a Collective Action Improper ........................................................20

    D.    Plaintiffs Have Not Established That Putative Collective Action Members Want To Opt-In To The Proposed Collective Action .................21

    E.    Plaintiffs Rely on the Wrong Standard; Because Substantial Discovery Has Occurred, A Stricter Second-Step Analysis Should Apply ........................................................21

i

1

F.      Plaintiffs' Proposed Notice Contains Numerous Deficiencies And
        Cannot Be Sent To Putative Class Members ................................................23

CONCLUSION...............................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION
Case No. C 08-04592 SC

1

2

## **TABLE OF AUTHORITIES**

3

**Page(s)**

CASES

4

5

*Adams v. Inter-Con Sec. Systems, Inc.,*
   242 F.R.D. 530 (N.D. Cal. 2007).................................................................14, 21, 22, 24

6

7

*Basco v. Wal-Mart Stores, Inc.,*
   2004 WL 1497709, at *7 (E.D. La. Jul. 2, 2004)......................................15, 20, 23

8

*Bunyan v. Spectrum Brands, Inc.,*
   2008 WL 2959932, at *4 (S.D. Ill., Jul. 31, 2008) ....................................................22

9

10

*Burk v. Contemporary Home Svcs., Inc.,*
   2007 WL 2220279, at *4 (W.D. Wash. Aug. 1, 2007) ..........................................17

11

*Castle v. Wells Fargo Financial, Inc.,*
   2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) ................................................17

12

13

*Cohen v. Allied Steel Buildings, Inc.,*
   554 F. Supp. 2d 1331 (S.D. Fla 2008) ....................................................................24

14

*EEOC v. MCI Int'l, Inc.,*
   829 F. Supp. 1438 (D. N.J. 1993) ...........................................................................20

15

16

*England v. New Century Fin. Corp.,*
   370 F. Supp. 2d 504 (M.D. La. 2005)......................................................................20

17

*Harper v. Lorett's Buffet Inc.,*
   185 F.R.D. at 358 (M.D. Ala. 1999) .......................................................................23

18

19

*Hinojos v. The Home Depot, Inc.,*
   2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006)....................................................17

20

*Leuthold v. Destination America, Inc.,*
   224 F.R.D. 462 (N.D. Cal. 2004).............................................................................22

21

22

*Lockhart v. Village of Riverdale,*
   2003 WL 21212589, at *3-4 (N.D. Ill. May 20, 2003)...........................................16

23

*Lusardi v. Xerox Corp.,*
   118 F.R.D. 351 (D. N.J. 1987).................................................................................20

24

25

*McLaughlin v. Richard Shoe,*
   486 U.S. 128 (1988).................................................................................................24

26

27

28

LA1 6918922.2

*Nunnery v. Groelle & Salmon, P.A.*,
  2007 WL 781369 (M.D. Fla. Mar. 12, 2007) ..........................................................24

*Pfohl v. Farmers Ins. Group*,
  2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) ...........................................21, 22

*Ray v. Motel 6 Operating, Ltd. P'ship*,
  1996 WL 938231, at *2, 4 (D. Minn. Mar. 18, 1996) ...........................................15

*Reed v. Mobile County Sch. Sys.*,
  246 F. Supp. 2d 1227 (S.D. Ala. 2003)...................................................................19

*Rivera v. Solstice Capital Group, Inc.*,
  2008 WL 4384123, at *3 (C.D. Cal. Aug. 21, 2008)..............................................16

*Rodgers v. CVS Pharmacy, Inc.*,
  2006 WL 752831, at *4 (M.D. Fla. March 23, 2006)..............................................18

*Silverman v. SmithKline Beecham Corp.*,
  2007 WL 6344674, at *2 n.5 (C.D. Cal. Oct. 15, 2007)...............................18, 21, 22

*Simmons v. T-Mobile USA, Inc.*,
  2007 WL 210008, at *8 (S.D. Tex. Jan. 24, 2007) ................................................15

*Smith v. T-Mobile USA, Inc.*,
  2007 WL 2385131, at *3 (C.D. Cal. Aug. 15, 2007)........................................14, 17

*Theissen v. General Electric Capital Corp.*,
  267 F.3d 1095 (10th Cir. 2001) ............................................................................16

*Thompson v. Speedway Superamerica LLC*,
  2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009)...........................................15, 21

*Trinh v. JP Morgan Chase & Co.*,
  2008 WL 1860161, at *5 (S.D. Cal. Apr. 22, 2008).........................................20, 21

*Tucker v Labor Leasing, Inc.*,
  872 F. Supp. 941 (M.D. Fla. 1994)........................................................................23

*Walling v. Youngerman-Reynolds Hardwood*,
  325 U.S. 419 (1945)...............................................................................................14

*Williams v. Accredited Home Lenders, Inc.*,
  2006 WL 2085312, at *3 (N.D. Ga. July 25, 2006).........................................18, 23

*Wynn v. National Broadcasting Co., Inc.*,
  234 F.Supp. 2d 1067 (C.D. Cal. 2002) ..................................................................22

iv

STATUTES

29 U.S.C. § 207(a) ........................................................................................................14

OTHER AUTHORITIES

FRCP 41(a)(1)(B) ...........................................................................................................1

OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

LA1 6918922.2

Case No. C 08-04592 SC

# INTRODUCTION

Plaintiffs Marcelo Altimirano and Jackey Wilson II ("Plaintiffs")[1] ask that Court-sanctioned notice be sent to every Account Executive ("AE") who has worked at any of Defendants' 1,450 retail branch locations across the country in the last three years. According to Plaintiffs, these potential plaintiffs *might* have worked off-the clock, and therefore *might* be entitled to unpaid overtime under the Fair Labor Standards Act ("FLSA"). In effect, after conducting significant discovery, Plaintiffs allege a handful of possible violations of the FLSA, and solely on that basis, with no evidence to support their class-wide allegations, ask this Court to extrapolate and conditionally certify a nationwide class of over 10,000 people. By contrast, Defendants present this Court with 83 declarations of former employees, and considerable additional evidence, disputing Plaintiffs' allegations and demonstrating that the nationwide extrapolation they seek is unwarranted.[2] Plaintiffs have not met their burden under Section 216(b) of the FLSA for such a sweeping request, and therefore, their motion should be denied.

---

[1] Paul Velasquez and Faviola Alvarez have twice dismissed their overtime claims against Defendants. On January 18, 2008, they filed, but never served, an identical purported collective action against Defendants in the Southern District of California. On September 17, 2008, Velasquez and Alvarez dismissed that lawsuit. On October 2, 2008, Velasquez, Alvarez and four additional Named Plaintiffs filed this complaint in the Northern District of California. Since then, four of the six Named Plaintiffs – Velasquez, Alvarez, Dionicio Martinez and Carlos Martinez - have voluntarily dismissed their claims. On July 15, 2009, Velasquez and Alvarez stipulated to dismissal pursuant to FRCP 41(a)(1)(B). Declaration of Regina A. Musolino ¶ 34. Since this operates as "an adjudication on the merits" neither should be permitted to participate in this action. Additionally, Velasquez's FLSA claims are barred by the statute of limitations and his testimony should be stricken. See Defendants' Motion to Strike and Objections to Evidence filed concurrently.

[2] All 83 declarants, which include 22 putative class members, are former employees. Each declaration was signed after Defendants announced the closure of the business, and all of these individuals understood that they were losing their jobs. See e.g., Anthony Gooden dep. 19:8-16 (had no reason to believe that providing a declaration would enhance any chances for future employment), Joseph Gunning dep. 17:18-18:3; Dan Marinelli dep.10:11-14; Andrew Hilley dep. 32:11-17 (no promise in exchange for declaration); Musolino Decl. ¶ 14 and exhibits referenced therein. Any assertion by Plaintiffs that these declarations were coerced, or that these witnesses were concerned about keeping their jobs, is extremely ill-conceived in these unique circumstances.

1

1    Plaintiffs' motion fails for two fundamental reasons.  First, Plaintiffs have not met their

2  burden of showing that they are similarly situated to other potential class members—that they

3  and the putative class were the victims of a single decision, policy, or plan that violates the

4  FLSA.  Faced with Defendants' vigilant enforcement of its indisputedly valid time entry

5  policies, Plaintiffs attempt to create an unlawful practice involving commonly-used business

6  metrics such as "sales quotas" and "labor budgets," but provide no evidence whatsoever to

7  support their argument.  Second, Plaintiffs have not met their burden of showing that other

8  potential class members are interested in joining this case.

9

10    The failure to identify a single decision, policy, or plan highlights the individual nature

11  of these claims, rendering them inappropriate for collective action certification for resolution.

12  Each of Plaintiffs' individual claims rests on distinct facts requiring a separate analysis, and

13  the claims of any potential plaintiff would require a similarly fact-intensive inquiry.  In

14  addition to the particularized inquiry necessary for potential plaintiffs to present their claims,

15  each potential plaintiff also will be subject to individual defenses by Defendants.

16  Consequently, judicial economy is not served by granting Plaintiffs' motion.

17

18    Finally, Plaintiffs have not met their burden of showing that other potential class

19  members are interested in joining this case.  Four of the named Plaintiffs have dismissed their

20  claims and withdrawn their consents.  Two of these four (Velasquez and  Alvarez) have twice

21  dismissed their claims, resulting in an adjudication on the merits.  (See Footnote 1.)

22  Moreover, although Plaintiffs' counsel apparently have been soliciting participation since well

23  before filing the complaint,[3] out of a potential class of 10,000 individuals,[4] they have found

24

25

26  _____

[3] Plaintiff Jackey Wilson dep. 55:9-57:24; 62:12-64:22; 95:12-97:12 (prior to 2009, he
27  received an unsolicited "mail-out" from Plaintiffs' counsel, essentially the complaint with
his name on it along with a form to sign and mail back to Plaintiffs' counsel; he did not
28  know how his name came to be on that document and until then he had never thought
about consulting an attorney in connection with his employment at HSBC); Alvarez dep.

only seven other former employees—or .0007%, less than 1/1,000 of the putative class— to opt in to the case. Such a showing is insufficient to sustain a motion for collective action certification. Because Plaintiffs have not met this basic requirement of Section 216(b), conditional certification is not appropriate.

**BACKGROUND**

**A.   Overview**

HSBC Finance Corporation ("HSBC") is a financial services company whose subsidiaries provide consumers real estate secured loans, auto finance loans, personal non-credit card loans and specialty insurance products. From 2005 through 2009, HSBC conducted its consumer lending business nationwide through approximately 1,450 Beneficial- and HFC-branded branches.[5]

Defendants sold their consumer lending products through AEs who worked at the branches.[6] From 2005 through 2009, Defendants employed approximately 10,000 AEs.[7] These AEs were non-exempt employees who primarily spent their days cold-calling referrals provided to them by Defendants, and handling paperwork relating to loan applications.[8] AEs were provided daily lists of potential customers and were not required to procure sales from their own sources.[9]

---

12:4-15:20 (first heard about the complaint when she received an unsolicited call from Plaintiffs' counsel on her cell phone; she didn't know how Plaintiffs' counsel got her number and prior to that time she had never thought about suing HSBC for any wage issues); see also Marcelo Altamirano dep. 34:8-36:2, 145:13-146:21; Christopher Carney dep. 64:20 to 65:3; Chad Klingensmith dep. 7:23-8:18; Velasquez dep. 68:15-69:25, 181:3 -183:16; Alvarez dep. 12:4 -15:20.

[4] Declaration of Maureen Gillan-Myer ¶4.

[5] *Id.* In April 2009 HSBC closed the consumer lending division, which included all Beneficial and HFC branches. *Id.* ¶4. By that time, all AEs, Branch Sales Managers and District Sales Managers were terminated. *Id.*

[6] *Id.* ¶5. "AEs" includes both Account Executives and Senior Account Executives.

[7] *Id.*

[8] *Id.*

[9] *Id.*

---

3

These branches had an average of 3.8 AEs.[10]  Each branch had its own Branch Sales Manager ("BSM") who oversaw the operations of the branch, enforced company policies and supervised employees, including AEs.[11]   BSMs reported to a District Sales Manager ("DSM") who typically had 8  branches in his or her district.[12]  Districts rolled up into divisions which were grouped into regions.[13]  In total Defendants employed approximately 2,000 BSMs and 200 DSMs during the relevant time period, with the number of divisions ranging from 10-16 in 2-3 regions nationwide during the period 2005-2008.[14]

**B.     Defendants' Timekeeping Polices Prohibited Unpaid Work**

   **1.  Defendants' Policies and Training**

Defendants had facially-valid timekeeping policies that complied with the requirements of the FLSA.[15]  These policies required employees to record all hours worked.[16] As former long-term DSM Dan Marinelli put it, "…the company was always big on making sure that its employees knew that time sheets had to be done properly, time had to be accurate per the minute."[17]  Plaintiffs confirmed that they were aware of this policy, and many confirmed that they followed it.[18]  Defendants  prohibited employees from working from

---

[10] *Id.* ¶6.

[11] Maureen Gillan-Myer dep. 33:2-37:21.

[12] *Id.* at 45:14-19.

[13] *Id*. at 45:21-46:11; Michael Fitzpatrick dep. 25:11-15.

[14] Gillan-Myer Decl.¶6.

[15] *Id*. ¶7.  All timekeeping policies were the same for Defendants. Gillan-Myer dep. 13:21-14:6.  Plaintiffs do not assert that any of Defendants' written policies violate the FLSA.

[16] *Id*. ¶¶7, 8, exhibits Q-Y; Musolino Decl. ¶10 and exhibits referenced therein.

[17] Marinelli dep. 20:25-21:3.  Marinelli worked for Defendants for 32 years, 22 years as a DSM, and as a DSM oversaw between 8-12 branches at a time, with an average of 22 to 48 AEs .  *Id*. at 7:21-8:11, 23:16-24:5.

[18]  See Wilson dep. 42:5-43:1, 70:11-17, 73:19-74:1; 99:22-102:24 (consistent with policy, Wilson recorded all time worked in the HSBC time-entry system, and always was on the clock and paid for time spent driving to a client's home to perform services and for the approximate 5 occasions when he stayed late to close loans; no other AE ever told him they had not been paid for all hours worked).  Opt-in Plaintiff Klingensmith testified that Defendants' policy required him to record time from the minute he entered the office, before he even logged into his computer.  Klingensmith dep. 29:9-25, 68:11-23.  Opt-in Plaintiff Austin Walters testified that he understood company policy was to record all time

4

1   home, or during meal or break times.[19]  Defendants' policy, as stated in its handbook, was to

2   pay non-exempt employees, including AEs, for all hours worked.[20]

3          In order to control overtime expenses, DSMs generally had to approve overtime

4   work,[21]  however company policy required proper payment for overtime work, regardless of

5   whether it was approved.[22]  Despite Plaintiffs' allegations and Defendants' policies to control

6   overtime, BSMs did not usually have difficulty obtaining approval.[23]  Further, Plaintiffs

7   conceded that Defendants did not discipline them for requesting or submitting overtime.[24]

8   _____

9   spent working.  Walters dep. 44:22-45:5, 55:10-56:14.  Opt-in Plaintiff Carney conceded
    at deposition that, further to the policy, he recorded his time correctly (contradicting his
10  earlier declaration).  Carney dep. 95:18-96:2, 107:20-108:22.  See also, Altamirano dep.
    85:21-86:2; 90:12-92:6 (understood he was to record all time by logging into the
11  timekeeping system when he began work at the branch  logging out when he left); Alvarez
    dep. 37:25-38:25, 54:17-55:10, 57:10-58:25, 59:10-25.
12  [19] Musolino Decl. ¶¶15, 16, exhibits referenced therein; Wilson dep. 39:12-41:8; 43:18-
    46:21; 73:19-74:1 (admits that at both branches, he never worked through his one-hour
13  meal period; he and other AEs always took a one hour uninterrupted meal period and he
    knows of no AE who did not; also admits he never worked at home and knows of no AE
14  who did).

15  [20] Gillan-Myer Decl.¶¶7, 8, exhibit Y;  Marinelli dep. 104:20-105:1 ("...as far as the
    company knowing about [overtime] and refusing to pay for it, no, I have never heard of
16  that happening"); Walters dep. 64:6-20 (he understood that policy required proper payment
    for overtime worked); Musolino Decl. ¶ 7 and exhibits referenced therein.

17  [21] Gillan-Myer dep. 38:11-24; Gooden dep. 25:25-26:18.  As further evidence of the
    impropriety of a collective action, however, some managers do not recall DSM approval
18  being necessary for overtime.  See Marinelli dep. 62:19-25.  Additionally, some DSMs
    testified that there were budgeted overtime hours, and others indicated that there was no
19  such budgeting.  Compare Gooden dep. 26:8-16 (overtime was not limited; "...it was
    based on business needs and that was it") to Hilley dep. 86:1-87:3 (within his district, the
20  budget provided for two hours of overtime per employee per pay period or per week,
    although the budget was different for every office); Gillan-Myer Decl.¶ 8, exhibit R.
21  [22] Gillan-Myer dep. 39:1-19. Marinelli dep. 92:7-9 ("There is no such thing as off-the-
    clock work.  If they work they get paid for it."); Hilley dep. 121:20-23; Musolino Decl. ¶7
22  and exhibits referenced therein.

23  [23] Gooden dep. 27:20-25 ("[i]f we needed overtime, it was—I always approved it");
    Musolino Dec ¶7, exhibits referenced therein; Morrison Decl ¶¶ 4-5 ("[e]ven though
24  overtime was managed, AEs who worked in my branches always got paid for time worked.
    When I interviewed new Branch Managers, I told them right up front the importance of
25  following the rules.  There is no gray area – if an AE worked, he or she was paid").

26  [24] Carney dep. 93:15-17; Alvarez dep. 53:3-15, 54:13-55;15; Opt-in plaintiff David
    Almazan dep. 158:7-17 (does not recall any branch manager having an issue with his
27  recording overtime, or disciplining him for overtime).  When asked whether paying
    overtime was frowned upon, Marinelli responded, "No. You pay the employees for what
28  they worked. So if they worked it then you pay them for it."  Marinelli dep. 71:23-25.

1    Defendants disseminated their timekeeping policies through new employee orientation

2    and training, in the Employee Handbook, which was available to all AEs, and on the

3    Defendants' intranet.[25]  Plaintiffs confirmed that they received training on Defendants' time-

4    keeping policies.[26]  Defendants also trained their managers on FLSA compliance.[27]

5    Additionally, Defendants periodically sent bulletins to the branches reminding employees of

6    the importance of recording all time worked, and BSMs would review these bulletins and

7    policies with AEs.[28]

8    Plaintiffs largely concede that managers did not tell them to work off of the clock.[29]

9    Even their individual claims of failure to pay overtime are suspect, as Plaintiffs conceded that

10   they recorded and were paid for overtime during their employment.[30]

11

12   [25] Gillan-Myer Decl.¶8; Musolino Decl. ¶4 and exhibits referenced therein.

13   [26] See, e.g., Carney dep. 40:14-22, 46:12-49:22; Klingensmith dep. 60:13-21, 61:1-6.

14   [27] Gillan-Myer Decl¶ 8; Marinelli dep. 21:3-4 ("I mean, every six months you got
     training"); Joseph Gunning dep. 57:13-59:14; 64:3-65:13 (with respect to training on time
     entry and overtime policies, "that was nonstop throughout my career there"); Musolino
15   Decl.¶3 and exhibits referenced therein. Managers also discussed overtime policies during
     regular conference calls. Marinelli dep. 37:1-17. Part of a BSM's job duties was to ensure
16   that AEs were in compliance with time entry policies. Gillan-Myer dep. at 42:15-43:21.

17   [28] Marinelli dep. 37:19-38:4, 39:1-4 (agreeing that if it was in a bulletin that meant that it
     was important to the company); Walters dep. 32:2-10, 40:7-23, 74:3-75:9 (Defendants
18   went over timekeeping policies with employees every six months); Musolino Decl. ¶5  and
     exhibits referenced therein.

19   [29]  Altamirano dep. 88:19-21;102:11-13 (does not recall anybody at HSBC telling him to
     work off the clock or not to record overtime if he had worked it); Wilson (admits he
20   recorded all time worked, see footnote 18) Carney dep. 53:22-25, 58:16-23 (no manager
     ever told him to work off the clock, or to work through lunch); Walters dep. 47:4-51:10,
21   59:13-62:5, 66:17-68:22, 64:14-20, 131:6-132:24 (BSM never told him to work off the
     clock, never told him to miss meal breaks;  Walters just assumed that his BSM knew he
22   was working and not recording the time;  although he knew that he had to seek approval,
     he never did so); Alvarez dep. 41:12-22; 60:17-61:20 (personally told by her manager not
23   to work after clocking out; never worked through a meal or rest period and knows of
     nobody who did).  Other former employees confirm that as AEs they were never told, and
24   as managers they never instructed anybody, to work off of the clock. Musolino Decl. ¶10
     and exhibits referenced therein.

25   [30] See, e.g., Carney dep. 68:19-24; Klingensmith dep. 42:2-7; Walters dep. 87:15-89:15
     (conceded that he was usually paid for three to six hours of overtime per week); Alvarez
26   dep. 53:3-55:15; Almazan dep. 156:23-159:5; Altamirano dep. 105:11-13; 119:8-12.  Opt-
     In Plaintiffs Martin, Carson and Griffths were also paid overtime while employed by
27   Defendants. Gillan-Myer Decl.¶ 14, exhibits Z, AA, BB.  Other former AEs confirm that
     they were paid for all time worked.  Musolino Decl. ¶ 9 and exhibits referenced therein.
28

6

## 2. Enforcement Of Policies

Defendants enforced their timekeeping policies company-wide.  In order to ensure enforcement of these policies, Defendants conducted regular audits of the branches.[31]  These audits, which also covered general operations matters, reviewed timekeeping, break and other policy compliance.[32]  Defendants also provided their employees several means to lodge complaints about unpaid work time. AEs could complain to the BSM, the DSM, to payroll or human resources or through an employee "tip line."[33]  Other than a few vague references about  talking to their BSMs, Plaintiffs submit no evidence that any Plaintiff utilized any complaint procedures.[34]

As further evidence that Defendants took their obligations under the FLSA and their own policies seriously, Defendants direct this Court to Plaintiffs' evidence, which reflect the investigations that Defendants undertook on the rare occasion when a complaint arose.[35]

---

[31] Marinelli dep. 35:20-36:19; Gillan-Myer Decl. ¶9; Cruse Supp. Decl. ¶ 7; Musolino Decl.¶ 6 and exhibits referenced therein.

[32] Jeffrey Barden dep. 26:2-27:7, 29:8-19 (managers would receive awards for exceptional audits); "Quality Assurance reviewed each branch's compliance with company policies, including loan documentation and adherence to payroll policies such as time entry and breaks for non-exempt employees. HSBC took compliance with company policies very seriously." Cruse Supp. Decl ¶7; Gillan-Myer Decl. ¶9; Musolino Decl. ¶ 6 and exhibits referenced therein.

[33] Gillan-Myer dep. 61:6-17; see also Gillan-Myer Decl. ¶8, exhibit Y ("If you are not paid for any overtime you worked, contact human resources").

[34] Wilson dep. 54:15-55:5, 102:10-24, 117:15-118:3; Walters dep. 42:1-17, 52:15-53:21, 69:3-19, 75:10-76:16  (when asked if he reported this unpaid overtime to anyone at HSBC, Walters' response was "[a]bsolutely not"); Carney dep.  50:13-52:7 (testifying that he does not recall complaining to a supervisor, HR, or a hotline); Altamirano dep. 41:14-22, 86:25-88:18; 124:7-125:17 (does not even know whether he complained, and does not recall if he ever sought to bring to management's attention any alleged time off  the clock driving to customers' homes or to training in other branches); Alvarez dep. 46:9-47:2; Klingensmith dep. 66:6-23, 79:6-9 (he never contacted the employee hotline or human resources regarding overtime issues); Almazan dep. 76:2-77:1.  Former managers also testified that they do not recall ever receiving complaints regarding overtime.  See Marinelli dep.47:19-48:9 (during his 22 years at Defendants, he does not recall receiving a single complaint regarding unpaid work hours, or missed meals or breaks); Hilley dep. 88:18-22 (no complaints regarding unpaid hours).

[35] Plaintiffs' Memo at 13; Marinelli dep. 78:18-24, 80:23-81:9 (when Defendants found employee improperly reporting her time, they took it very seriously and investigated it). Defendants provided training on these kinds of investigations.  Gooden dep. 31:12-20; Hilley dep. 89:3-5; Musolino Decl. ¶ 13, and exhibits referenced therein.

7

1  Managers understood the importance of these policies, and knew that if they did not pay

2  overtime for time worked, they could be terminated.[36]

3        Plaintiffs are unable to demonstrate that Defendants' policies violated the FLSA or that

4  Defendants failed to enforce those policies.  At most, Plaintiffs' testimony demonstrates that a

5  few employees might have worked a few hours off the clock occasionally without knowledge

6  or approval by management, or might have misinterpreted their managers' instructions.[37]

7  **C.     Compensation Policies Did Not Incentivize Unpaid Work**

8        Because Plaintiffs are unable to identify a single decision, policy, or plan to support

9  their conditional certification efforts, they instead present this Court with a handful of

10  complaints and attempt to cobble together an argument that a nationwide scheme exists,

11  despite these policies.  Defendants' evidence establishes that no such scheme exists, and

12  Defendants' compensation policies do not incentivize such a scheme.[38]

13

14

---

15  [36] Gooden dep..42:16-19 ("I didn't mess around with overtime because that was something
16  I could get fired for.  If somebody worked overtime, we paid it, period, end of story.  That
   was it"); Cruse Supp. Decl. ¶ 6; Musolino Decl. ¶ 13 and exhibits referenced therein.

17  [37] Almazan dep. 54:17-56:3, 58:7-59:11, 73:10-77:4, 78:2-81:10 (does not know if his
   BSMs were aware he was working and not recording his time; none of his 4 BSMs ever
18  told him not to record his time);  Altamirano dep. 85:21-88:18; 94:14-95:13;108:4-118:9
   (nobody told him to not record his time and he never told anyone that that he needed to
19  work off the clock but claims that it was his "interpretation" that he needed to do so to "get
   the job done;" he never sought to record alleged work time after clocking out and does not
20  know if anybody at HSBC knew about this); Carney dep. 49:23-50:16, 54:1-4, 57:5-20,
   71:8-12 (he did not recall whether he ever sought approval from a manager to work
21  overtime; he never told anyone in management that he was not recording all of his time; in
   fact, he could not recall whether he ever failed to record time that he worked); Walters
22  dep. 48:5-49:20 (asked how managers would have known he was working overtime if he
   did not report it, Walters conceded, "You know, I don't know, you know, how they would
23  have known, if they would have known.  I don't know"); Alvarez dep. 39:23-40:3; 41:12-
   22 (nobody gave her the "impression" that she should continue to work after clocking out
24  but she didn't want to "leav[e] things unfinished" so continued to work on a few occasions
   despite earlier being told personally by her manager to stop working after clocking out).

25  [38] Plaintiffs' testimony also does not support such a conspiracy theory.  At deposition,
26  when confronted with Defendants' instructions to its managers requiring proper payment
   of overtime, Walters had to concede that, even though he alleges his manager was told to
27  refuse to pay overtime, "I don't know what Mr. Morrow was told as far as this goes.  I just
   know what he said to us."  Walters dep. 71:1-73:1; see also Gillan-Myer Decl. ¶ 12; Cruse
28  Supp. Decl. ¶¶ 6-7; Musolino Decl. ¶ 8 and exhibits referenced therein.

### 1.  Management Pay Did Not Incentivize Unpaid Work

As with most companies that rely primarily on sales, Defendants structured their employees' income to reward employees for meeting and exceeding sales targets.[39]  The compensation policies and the incentive programs varied for different categories of employees.[40]  As explained below, only DSMs were eligible for a small bonus based on certain controllable expenses which included overtime, but otherwise, overtime expense did not affect the incentive compensation of any branch network employee.[41]

BSMs were paid salary and incentive compensation.[42]  The BSMs' incentive compensation was not based on labor costs.[43]  If periodic audits revealed that a BSM's branch was not in compliance with company policies, including overtime policies, Defendants reduced the BSM's incentive compensation.[44]  In other words, the only way that overtime would conceivably affect a BSM's compensation would be if the BSM failed to follow Defendants' overtime policies, in which case that BSM would lose money.[45]

DSMs were paid a salary as well as incentive compensation based on the production numbers of the branches and a "quality score."[46]  Additionally, DSMs were

---

[39] Gillan-Myer Decl.¶10.

[40] *Id.*; Fitzpatrick dep. 64:7-15.

[41] Fitzpatrick dep. at 51:18-21; Barden dep. 42:9-10; 50:21-51:20; Marinelli dep. 77:1-8 (overtime is a "small percentage" of controllable expenses); Gunning dep. 115:15-25 ("real estate expenses" "like appraisals." Those were the big ones that we always focused on"); Musolino Decl.¶ 8, and exhibits referenced therein.

[42] Barden dep. 29:23-30:3. In 2008, between salary and incentive compensation, the average BSM's total compensation was approximately $80,000.  Barden dep. 33:1-16

[43] Gillan-Myer dep. 109:5-13; Barden dep. 26:4-19, 29:23-30:3, 35:5-37:21; 41:19-42:21; Fitzpatrick dep. 60:15-61:13; Hilley dep. 50:7-10. A BSM's compensation was not based on profitability.  Barden dep. 42:9-11; Hilley dep. 46:3-23, 50:7-10; Musolino Decl. ¶8 and exhibits referenced therein.

[44]  Barden dep. 26:23-27:1;29:8-19; Cruse Supp. Decl.¶ 7.

[45] Barden dep. 26:23-27:1;29:8-19.  Further, managers were not disciplined for exceeding overtime budgets.  Gooden dep. at 53:23-54:7.

[46] Gooden dep. 40:19-41:13; Cruse Supp. Decl. ¶ 7.

9

eligible for a small quarterly bonus of $930 if all of the branches within their district

stayed within the "controllable expenses" for each branch.[47]  During the relevant time

period, both within and outside of California, overtime was a very small portion of those

controllable expenses.[48]  Further, this bonus was a small part of a DSM's compensation

and was not a meaningful incentive to let AEs work unpaid.[49]  This $930 **quarterly** bonus

was less than a quarter of a DSM's average $3,800 **monthly** incentive compensation.[50]

Overall production numbers were a much larger factor in the compensation.   As former

DSM Jeffrey Cruse stated, "I can think of no reason why I would  jeopardize a good, high

paying job for what I considered to be a small fraction of my overall compensation."[51]

BSMs and DSMs were not incentivized to violate Defendants' overtime policies,

and Plaintiffs present this Court with no evidence to the contrary.  Plaintiffs also fail to

present this Court with any evidence that management levels above the DSM tier benefited

from a nationwide scheme to avoid paying overtime.[52]

---

[47] Barden dep. 51:5-20;52:8-53:19 ("very small amount" of a DSM's compensation could
be affected by the amount of overtime at locations within his or her district; the amount
tied to these controllable expenses constituted "a fairly small part of their potential pay").
These expenses included appraisal costs, travel, overtime, employee recognition, and
appraisal and title waivers.  Fitzpatrick dep. 14:21-18:17; Barden dep. 46:9-19.

[48] Barden dep. 50:6-51:20; Cruse Supp. Decl. ¶ 4.

[49] Weldon Decl. ¶ 20 ("As a (DSM), I was eligible for a small quarterly bonus for having
my branches come within a certain percentage of budgeted expenses….I never ordered my
Branch Managers to make AEs work 'off the clock' so I could get a bonus."); Cruse Supp.
Decl. ¶¶ 6,7; Musolino Decl. ¶ 8 and exhibits thereto.

[50] Gillian-Myers Decl. (¶11) (DSMs earned an average base salary $75,000-83,000 and an
additional average of $3,800 per month as incentive compensation, with some earning up
to $11,000 per month).

[51] Cruse Supp. Decl. ¶6.

[52] For example, Regional General Managers had a base salary plus a discretionary bonus
based on a "number of business metrics to include profit measure, employee engagement
results, insurance results, loan account growth, productivity, expenses and employee
recruitment development" with profitability measured at a North American business unit
level.  Gillan-Myer dep. 104:21-107:23; see also Gillan-Myer Decl.¶ 12.  ("The
profitability piece of the overall bonus plan represented a small percentage of their total
targets.")

## 2.  Account Executive Sales Quotas Did Not Incentivize Unpaid Work

Defendants paid AEs a straight hourly rate for hours worked.[53]  All of the AEs,

Branches, and Districts had sales quotas,[54] which varied by district, division and region,

and changed over time to reflect changes in the economy.[55]  Despite Plaintiffs' vague

assertions to the contrary—in their brief Plaintiffs fail to identify a single quota for AEs—

the sales quotas for AEs were not onerous.[56]  Former DSM Anthony Gooden was asked,

"[i]n your experience, was it ever the case that AEs would actually be utilizing their time

in a proper way but yet still couldn't, quote, get the job done?" and he responded, "No, I

didn't see that it my district," agreeing that there was an expectation that 40 hours per

---

[53] Gillan-Myer Decl. ¶7.  AEs could also receive additional incentive compensation based on the overall branch performance.  Barden dep. 18:2-19:15; 23:4-26:17.

[54] Despite Plaintiffs' assertion that Defendants' incentive compensations reports (Plaintiffs' Exhs. S and T) represent "sales *requirements*" and therefore are sales quotas (Plaintiffs' Memo p. 6:1-2, emphasis in original), Plaintiffs submit no evidence that shows that these reports set forth the actual sales quotas for any given Account Executive. In fact, sales targets varied throughout the company. *See* footnote 55, *infra*. Additionally, Marinelli recalls that quotas were not for individuals, but were instead per branch. Marinelli dep. 96:14-97:21.  Gooden recalls that as a BSM, he received a branch goal, and then would break it down by employee.  Gooden dep. 25:3-7.

Further, production goals were reduced in 2007 to reflect the fact that the mortgage industry was in crisis.  Hilley dep. 79:7-80:3 ("I just know that the new money goals were reduced…. They made a real effort to help the Account Executives, help us all out."  ); Gunning dep. 50:9-51:6 ("[t]hey kept lowering goals for us, you know, to try to make it fair based on the economy and the market in general"); see also Musolino Decl. ¶ 18 and exhibits referenced therein.

[55]  With respect to the sales targets, "each branch went through an evaluation process, depending on where they were, what their history had been, what was going on in their economic development to determine what their opportunity was which plugged directly into their New Money goal." Barden dep. 19:6-17. "Starting in 2007, HSBC recognized that the market was in a downtown.  Sales targets were reduced to help Account Executives make their incentive compensation.  Sales targets always varied to a certain extent geographically but those variations became much more pronounced when the mortgage crisis hit.  Certain areas of the country were hit harder than others, such as Central California, where I was based.  Accordingly, HSBC set even lower sales targets for those areas to make it easier for the sales force to keep earning incentive compensation." Cruse Supp. Decl. ¶ 11.

[56] As Marinelli explained, even during the economic downturn, success was not a matter of working longer hours; it was a matter of working smarter, and that AEs did not ask to work longer hours to meet their goals.  Marinelli dep. 67:12-25.  Even before the downturn, some managers found the highest producers rarely needed to work overtime. Cruse Supp. Decl. ¶10; Musolino Decl. ¶¶ 11, 18 and exhibits referenced therein.

---

11

1    week was enough time to get the job done.[57]

2         Defendants evaluated AEs on numerous performance metrics, including production

3    numbers.[58]  In a sales environment, such a metric is a clear and objective measure of an

4    AE's performance.  Plaintiffs, however, take this common-sense and widespread business

5    practice—evaluating employees based on whether they are doing their job—and draw

6    from it the wholly unsupported inference that measuring production numbers inevitably

7    leads to an unlawful practice of forcing employees to work off the clock.  To buttress this

8    stretch in reasoning, Plaintiffs include a single performance evaluation of opt-in Almazan,

9    which states that he needed to work on his production.[59]  Even this lone innocuous

10   statement fails to support Plaintiffs' argument, however, because Almazan conceded at

11   deposition that this comment was made because he had just come back from a leave of

12   absence that affected his "pipeline," not because he couldn't meet his numbers in a regular

13   8-hour work day.[60]  Other Plaintiffs concede that they recorded all time worked, and rarely

14   worked overtime, a clear indication that they were able to meet their goals within a 40

15   hour workweek.[61]  Furthermore, Plaintiffs provide little evidence that any Plaintiff was

18   _____

19   [57] Gooden dep. 37:8-16; Hilley dep. 54:4-7; Musolino Dec ¶11 exhibits referenced therein.
     [58] Gillan-Myer Decl.(¶13).

20   [59] Motion at 6, 7.

21   [60] Almazan dep. 54:17-56:3, 58:7-59:11, 73:10-77:4, 78:2-81:10, 150:1-151:21. No
     evidence suggests that Almazan's production issues were related to how many hours he
22   worked. Almazan, who recorded and was paid overtime while working, testified that the
     amount of unpaid overtime that he worked was limited to a few cell phone calls to
23   customers made after work hours, a few instances where he stayed a little later to finish up
     a customer call or came in for an hour or so on a few Saturdays.  *Id.*
24
     Plaintiffs also cite a portion of Altamirano's testimony out of context regarding his ability
25   to meet his sales goals. Motion at 6:12-16.  Contrary to Plaintiffs' assertions, however,
     Altamirano testified that no one ever told him to work off the clock, he never told anyone
26   he couldn't meet his goals without working off the clock, he didn't know if any other AE
     needed to work off the clock to meet sales goals, and that he had never been disciplined or
27   warned about not meeting sales goals. Altamirano dep. 110:11-126:25.

28

                                                   12

1    disciplined or terminated for failing to meet those quotas.[62]

2    **D.    Litigation History**

3

4            Plaintiffs filed this lawsuit in October 2008, and since that time, substantial

5    discovery has taken place.[63]  Defendants have produced to date over 11,000 pages of

6    documents including timekeeping entries and payroll summaries, employee handbooks,

7    investigation files, incentive compensation policies, time entry and break policies, 83

8    declarations from Defendants' witnesses, a sample severance agreement, and branch

9    lists.[64] Plaintiffs have deposed four former District Sales Managers, and taken seven

10   30(b)(6)  depositions on dozens of topics.[65]  Defendants have deposed eight Named

11   Plaintiffs and former Plaintiffs and opt-in plaintiffs.[66]

12

13

14

15

16

---

17   [61] See, e.g., Wilson dep. 41:22-43:1, 99:22-102:24 (Wilson admitted that at all times
     during his tenure at HSBC he recorded his time on the time entry system, and specifically
18   on the approximate 5 occasions when he stayed late to close loans at end of month he was
     always on the clock); Alvarez dep. 39:23-40:3; 41:12-22 (nobody gave her the
19   "impression" that she should continue to work after clocking out but she didn't want to
     "leav[e] things unfinished" so continued to work on a few occasions despite earlier being
20   told personally by her manager to stop working after clocking out).  Musolino Decl. ¶11
     and exhibits referenced therein.

21   [62]  See Wilson dep. 74:9-19 (never disciplined for not making sales goals as he received
22   two favorable reviews).  Even if an AE was giving a warning regarding production
     numbers, Defendants gave AEs months of counseling and support to help the employees
23   increase their production.  Gillan-Myer Decl. ¶ 12; Gunning dep. 47:6-49:5.

     [63] Musolino Decl. ¶ 35.
24
     [64] Id.

25   [65]  Id.  Plaintiffs served 30(b)(6) deposition notices seeking testimony on timekeeping
     policies, HR policies, job descriptions, complaints about overtime, corporate structure,
26   labor budgets, compensations for branch employees, branch operations, tracking and
     editing of time entries, approval of overtime, executive compensation policies, training,
27   and e-discovery topics. Id.

28   [66] Id.

---

13

**ARGUMENT AND AUTHORITIES**

**A.      Plaintiffs' Case Theory Prevents Them From Meeting Their Burden of Showing That They And The Putative Class Are Similarly Situated**

**1.  No Single Decision, Plan, Or Policy Exists**

To succeed in their motion, Plaintiffs must demonstrate that they and the putative class members are similarly situated.  *See Smith v. T-Mobile USA, Inc.*, No. CV 05-5274 ABC (SSx), 2007 WL 2385131, at *3 (C.D. Cal. Aug. 15, 2007)) ("some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency").[67] As some courts have explained, plaintiffs seeking conditional certification must show that the putative class members "were together the victims of a single decision, policy, or plan" that violates the FLSA.  *Adams*, 242 F.R.D. at 536 (conditional certification requires that "plaintiffs make substantial allegations that the putative class members were subject to a single illegal policy, plan or decision").

But here, Plaintiffs' liability theory precludes such a finding.  Plaintiffs do not identify any single decision, policy, or plan that violates the FLSA.  Instead, Plaintiffs allege that (1) Defendants established sales targets for its AEs; (2) Defendants established budgets and overtime policies; and (3) Defendants expected their managers to control expenses.[68]  As a result of this confluence of factors, Plaintiffs allege, they and 10,000 others were not paid for the overtime that they allegedly worked.[69]

---

[67] The term "similarly situated" is not defined under the FLSA and the Ninth Circuit has yet to address the issue.  *Adams v. Inter-Con Sec. Systems, Inc.*, 242 F.R.D. 530, 535-36 (N.D. Cal. 2007) (internal citations omitted).

[68] Plaintiffs' Memo at 7-11.  Of course, there is nothing nefarious about avoiding overtime.  Plaintiffs essentially argue that Defendants' goal of minimizing overtime is somehow improper.  To the contrary, the Supreme Court has observed that the FLSA was specifically designed to discourage overtime by making it more expensive:  "[B]y increasing the employer's labor costs by 50% at the end of the 40-hour week and by giving the employees a 50% premium for all excess hours, Section 7(a) [29 U.S.C. § 207(a)] achieves its dual purpose of inducing the employer to reduce the hours of work and to employ more men and of compensating the employees for the burden of a long workweek."  *Walling v. Youngerman-Reynolds Hardwood*, 325 U.S. 419, 423-24 (1945).

[69] Plaintiffs' Memo at 11-14.  Plaintiffs repeatedly refer to "all" AEs but only cite to the testimony of eleven individuals.

14

Numerous courts have specifically held that such allegations do not constitute a single decision, policy or plan supporting certification of a collective action.  *See Thompson v. Speedway Superamerica LLC*, No. 08-CV-1107 (PJS/RLE), 2009 WL 130069, at *2 (D. Minn. Jan. 20, 2009)  (certification denied where plaintiffs failed to "submit evidence that the *reason why the employees were not compensated … is not because of human error or a rogue store manager, but because of a corporate decision to ignore [its] policies and refuse to pay*"); *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 WL 210008, at *8 (S.D. Tex. Jan. 24, 2007) (certification denied where plaintiffs argued that employer assigned work that required more than 40 hours per week to complete, gave its employees sales quotas, and discouraged supervisors from authorizing overtime, court finding that plaintiff nonetheless had "not met his 'fairly lenient' burden to allege, with a factual basis, that he and the potential plaintiffs together were victims of a common policy or plan that violated the law") (citations omitted).[70]

### 2.   Plaintiffs' Reliance on Defendants' Enforcement Efforts Is Misplaced

To support conditional certification, Plaintiffs provide Defendants' records reflecting investigations of alleged timekeeping irregularities.[71]  These records establish three things, none of which support Plaintiffs' case.  First, they prove that Defendants have diligently investigated complaints about improper timekeeping practices.  Second, they show how infrequent these complaints have been.  The exhibits provided by Plaintiffs reflect five investigations.  This is not evidence of the "*de facto* policy" Plaintiffs allege—to the contrary, it shows how rare these violations are.  *See, e.g., Lockhart v. Village of Riverdale*, No. 02-C-0192, 2003 WL 21212589, at *3-4 (N.D. Ill. May 20, 2003) (no discriminatory policy where

---

[70] *See also Basco v. Wal-Mart Stores, Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, at *7 (E.D. La. Jul. 2, 2004) (certification denied, court finding that, "[s]imply put, plaintiffs seek to make a corporate policy to keep employee wage costs low sufficient proof to justify the creation of a class of all Wal-Mart employees that have not been properly paid overtime in the last three years. It is obvious from the discovery presented that this 'policy' and its effects are neither homogeneous nor lend themselves to collective inquiry"); *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *2, 4 (D. Minn. Mar. 18, 1996) (certification denied where plaintiffs claimed that employer's lawful policies "implicitly demonstrate[d] the need and practice for assistant managers to work overtime").

[71] Plaintiffs' Memo at 13.

---

OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION
Case No. C 08-04592 SC

LA1 6918922.2

employer's official policy prohibits discriminatory conduct and employer regularly investigated complaints).  Third, Defendants' investigative records reinforce that each situation is unique, and that each complaint must be examined independently.  For example:

- One employee worked additional overtime, for which he was compensated, during a time period when that employee was the only AE at the location (see Plaintiffs' Exhibit EE).  That employee did not suggest that the failure to previously submit the overtime was at the direction of any HSBC employee, or was the result of any policy or plan. (*Id.*).
- Another employee presents a number of complaints, among them the allegation that the employee had never asked for overtime, despite allegedly working overtime (see Plaintiffs' Exhibit BB).   Again, that employee did not suggest that the failure to submit the overtime was at the direction of any HSBC employee, or was the result of any policy or plan. (*Id.*).
- A third employee alleged entitlement to overtime that was not previously submitted, based on instruction from the Branch Manager to keep time at 40 hours per week, and her refusal to submit more than 2-3 hours of overtime per month (see Plaintiffs' Exhibit FF).
- Plaintiffs also submit notes reflecting interviews with four employees (see Plaintiffs' Exhibit AA).  Contrary to Plaintiffs' description of the Exhibit (see Memo at 13), the document reflects that each employee interviewed provided different information—two of the four employees stated that they had never worked off the clock, a third identified 3-4 hours total worked off the clock, and the fourth employee stated he had worked less than 20 hours off the clock several years prior to the interview (see Plaintiffs' Exhibit AA).  One employee stated that the manager substituted "comp time for overtime," while another employee did not submit overtime, at the direction of the manager (*Id.*).[72]
- Plaintiffs submit emails reflecting issues with a Branch Manager in 2008 (see Plaintiffs' Exhibit DD).  The Branch Manager was assigned in January 2008; AEs complained about a number of issues related to this Manager in February 2008; HSBC interviewed the AEs and confirmed that none had any unreported or unpaid overtime hours worked, in March 2008; and upon conclusion of the investigation, HSBC placed the Branch Manager on a final warning (*Id.*).

Nothing in these exhibits suggests that anyone was the "victim of a single decision, policy, or plan" that violates the FLSA.  *Rivera v. Solstice Capital Group, Inc.*, No. CV 07-1852 PSG (VBKx), 2008 WL 4384123, at *3 (C.D. Cal. Aug. 21, 2008) (quoting *Theissen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001)).   Instead, they

---

[72] When asked whether managers encouraged working off-the-clock, one employee stated that one manager had, but "[n]o one else because everyone else knew the policy"  *Id*. at 3.

reflect a number of dissimilar complaints that do not provide a basis for treating this lawsuit as a collective action.

### 3. Because Plaintiffs Cannot Identify A Single Plan Or Policy, They Cannot Demonstrate That They Are Similarly Situated

In this case, each putative class member's claim depends—not on the application of a single illegal plan or policy—but on whether the putative class member or his or her manager personally decided to violate Defendants' policies, and, if so, whether that violation led to an actionable overtime claim under the FLSA. Each person's claim stands on individualized facts, and for that reason alone, conditional certification is improper and should be denied.

Federal courts facing similar theories have almost uniformly denied certification, because the theory itself requires discrete inquiries about what happened to individual employees at distinct locations under separate managers. *See, e.g.*, *Castle v. Wells Fargo Financial, Inc.*, No. C 06-4347 SI, 2008 WL 495705, at *5 (N.D. Cal. Feb. 20, 2008) (denying conditional certification, noting that "other courts have denied certification under the FLSA in 'off-the-clock' cases, finding that individual issues predominate….") (collecting cases); *Smith*, 2007 WL 2385131, at *5-6 (certification denied where, despite plaintiffs' allegations of "systematic, company-wide disregard for wage and hour laws," the evidence reflected "only sporadic violations [of lawful company policy] arising out of individual circumstances").[73]

## B. Potential Plaintiffs' Claims Would Require Individualized Inquiry

### 1. Each Claim Would Require An Individualized Inquiry

A fact-specific analysis would be required for any potential plaintiff. Their claims would require a review of their time and payroll records, and compared with their allegations, testimony, and the testimony of other former employees. Then, even if a potential plaintiff

---

[73] *See also Burk v. Contemporary Home Svcs., Inc.*, No. C06-1459RSM, 2007 WL 2220279, at *4 (W.D. Wash. Aug. 1, 2007) (plaintiffs claimed that policies, though lawful, nonetheless required them to work off the clock, certification was improper because the proposed class members "were not together the victims of a single decision, policy, or plan"); *Hinojos v. The Home Depot, Inc.*, No. 2:06-CV-00108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006) (certification denied where plaintiffs failed to identify any improper common practice).

---

17

1   were able to prove their time records were inaccurate, the Court would have to determine

2   whether the alleged inaccuracies are of a magnitude to result in an overtime wage violation.

3          Aside from their own testimony, Plaintiffs provide no detailed accounts that would

4   support a finding that their experiences are similar to those of a nationwide class of

5   employees.[74]  Defendants, by contrast, have produced numerous declarations from former

6   employees from all over the United States showing that Plaintiffs' alleged experiences were

7   extremely rare.  In light of these declarations, certification is unwarranted.  *See Williams v.*

8   *Accredited Home Lenders, Inc.,* No. 1:05-CV-1681-TWT, 2006 WL 2085312, at *3 (N.D. Ga.

9   July 25, 2006) (finding that plaintiffs did not meet "their burden of making a rudimentary

10  showing of commonality of claims" where defendant submitted declarations from employees

11  who testified that they were always properly paid for overtime and always accurately recorded

12  their time); *Rodgers v. CVS Pharmacy, Inc.*, 8:05-CV770T-27 MSS, 2006 WL 752831, at *4

13  (M.D. Fla. March 23, 2006). (denying conditional certification, noting that affidavits had been

14  submitted by plaintiffs' coworkers denying that they had been forced to work without proper

15  compensation).  As even Plaintiffs' evidence demonstrates, the only way to tell whether a

16  claimant has a legitimate complaint about purported off-the-clock work is to examine each

17  situation on its own merits.

18      **2.  Each Potential Plaintiff's Claim Would Require An Individualized
            Inquiry Regarding Supervisors**

19

20         Plaintiffs do not allege that Defendants' written policies—the only policies common to

21  all putative class members—require anything other than proper payment to employees for all

22  time worked.  Plaintiffs do not even assert that every manager violated the law and

23  Defendants' policies—only that they were "incentivized" to do so by Defendants.[75]  Plaintiffs'

---

24  [74] In fact, the only "uniformity" in Plaintiffs' allegations stem from the fact that the opt-ins
    signed boilerplate declarations.  Such declarations are insufficient to support conditional

25  certification.  *See Silverman v. SmithKline Beecham Corp.*,  No. CV 06-7272 DSF (CTx),
    2007 WL 6344674, at *2 n.5 (C.D. Cal. Oct. 15, 2007)  (court noting that it "strongly

26  disapproves of the use of boilerplate attorney-drafted declarations" and questioning
    "whether such boilerplate 'testimony' would be sufficient to meet Plaintiff's evidentiary

27  burden").

28  [75]  Plaintiffs' Memo at 11.

---

1    case thus rises and falls—not on the proof of any single plan, policy or decision—but rather on

2    how individual managers may have reacted to alleged budgetary pressures.  The fact that

3    putative class members reported to different supervisors—whose personal motivations and

4    decisions determined whether and where violations have occurred—thus weighs against

5    conditional certification.

6            Far from being nationwide, the policy violations Plaintiffs allege are exceedingly rare.

7    Plaintiffs present five instances where Defendants investigated wage irregularities.  Of the

8    1,450 locations, these allegations involved 10 locations, or .007% of the locations.  Plaintiffs

9    include testimony of an extremely small number of putative class members.  By contrast,

10   Defendants present declarations and testimony from numerous direct and high-level managers

11   who managed hundreds of AEs and BSMs, stating that they have never received complaints

12   that any of the managers under their supervision ever failed to pay overtime.[76]   Plaintiffs'

13   limited, widely-contradicted evidence fails to show that a significant number of Defendants'

14   managers acted the same way in which Plaintiffs claim their supervisors did—let alone "in

15   lockstep." *Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1233 (S.D. Ala. 2003).

16           Defendants maintained a policy strictly forbidding off-the-clock work.  Managers

17   received continuous training regarding timekeeping policies, and understood that they would

18   lose incentive compensation for poor audits and could be terminated for violating the

19   timekeeping policies.   Plaintiffs cannot legitimately claim that Defendants' managers

20   consistently decided to ignore Company policy and risk their careers.  The best that Plaintiffs

21   can come up with is an very small, quarterly incentive for DSMs, a small portion of which was

22   dependent on overtime expenses, that was dwarfed by their monthly incentive compensation.

23           If a manager decided to deviate from policy despite all of this, he or she did so as an

24   individual.  Proceeding as a collective action would inevitably require individual

25   determinations on whether each manager in fact made that decision and departed from

26   Defendants' policies.  A collective action cannot proceed under these circumstances.

27

28   [76] Musolino Decl. ¶ 12 and exhibits referenced therein.

19

**3.  Each Putative Class Member Is Subject to Different Defenses**

Courts regularly decline to certify off-the-clock classes because employers are entitled to raise claimant-specific defenses of a legal or factual nature.  *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D. N.J. 1987); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 509-10 (M.D. La. 2005); *Basco*, 2004 WL 1497709, at *8.   Such defenses may include the following:

- a particular class member did not work off the clock;
- a class member who worked off the clock failed to avail himself to curative steps that the employer made available to ensure proper compensation;
- a class member had knowledge of the employer's policies banning off-the-clock work, but voluntarily violated that policy for any  number of reasons;
-  a particular class member had a unique animus toward the employer that would cause fabrication or inflation of claim;
- a class member's purported off-the-clock time was *de minimus*; or
- a member's purported off-the-clock time did not comprise compensable work.

Defenses to Plaintiffs' claims would require anecdotal, particularized proof from each class member—not to mention his or her manager and co-workers—and provide yet another reason why certification would render a collective trial unmanageable in this case.

**C.    Fairness and Procedural Considerations Make a Collective Action Improper**

Fairness and procedural factors also weigh against proceeding as a collective action. Judicial economy is not served by joining disparate claims together, as it quickly becomes "a monster that no one can deal with."  *EEOC v. MCI Int'l, Inc*., 829 F. Supp. 1438, 1445-46 (D. N.J. 1993).  Here, trial would dissolve into a series of dozens of mini-trials, which contravenes the purpose of FLSA Section 216(b).  *See  Trinh v. JP Morgan Chase & Co.*, No. 07-CV-1666 W(WMC), 2008 WL 1860161, at *5 (S.D. Cal. Apr. 22, 2008) (denying certification, court finding "[b]ecause of the individualized inquiries involved, the Court finds that judicial economy would not be advanced by allowing this suit to proceed as a collective action").  Such an ordeal would challenge the most sophisticated jury and compromise Defendants' due process right to a fair trial.  *See Lusardi*, 118 F.R.D. at 372 ("[The FLSA] permits class actions only where employees are similarly situated in order that a defendant be afforded an

LA1 6918922.2

1   opportunity to effectively defend.  Requiring less would … amount to a deprivation of a

2   property right in violation of the Due Process Clause.").  These factors dictate that Plaintiffs

3   should not be allowed to proceed with a collective action that is "collective" in name only.

4   **D.      Plaintiffs Have Not Established That Putative Collective Action
            Members Want To Opt-In To The Proposed Collective Action.**

5

6        Plaintiffs have failed to produce credible evidence that a class of interested claimants is

7   waiting in the wings.  Out of a putative class of 10,000 people, they have found only seven

8   individuals interested in joining this suit, representing .0007% of the putative class.  This

9   small group is noteworthy because Plaintiffs' counsel have apparently conducted a widespread

10  mail-out and telephone campaign to encourage participation among potential Plaintiffs.[77]

11  Further, of the four named Plaintiffs who have dismissed their claims and withdrawn their

12  participation, Velasquez and Alvarez have done so twice.  (See Footnote 1)

13       Such a poor showing fails to prove that a class exists—in fact, as many courts have

14  observed, it demonstrates the opposite.  *See Thompson*, 2009 WL 130069, at *3 (certification

15  denied where, among other matters, two plaintiffs and eight opt-ins provided, at most,

16  evidence that "a tiny fraction of the 8,000 members of the putative class may not have

17  received some of the compensation that they were due"); *Silverman*, 2007 WL 6344674, at *2

18  (plaintiff's evidence "should demonstrate some likelihood that the proposed class members are

19  similarly situated and that *more than a minimal number* of prospective class members are

20  interested in joining the suit") (emphasis added).[78]

21  **E.      Plaintiffs Rely on the Wrong Standard; Because Substantial Discovery
            Has Occurred, A Stricter Second-Step Analysis Should Apply.**

22

23       While courts have employed several approaches to interpret whether the parties are

24

---

25  [77] Some Plaintiffs conceded they were unaware of others who may have worked off of the clock.  See, e.g., Wilson dep. 73:23-74:1 (no other AE ever told him he hadn't been paid for all hours worked).

26  [78] See also *Pfohl v. Farmers Ins. Group*, No. CV 03-3080 DT (RCX), 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) (plaintiffs failed to meet burden of showing interest among putative class members where they "failed to come up with significant numbers of allegedly similarly situated employees who are likely to assert similar claims").

27

28

21

1   "similarly situated," courts within this circuit generally follow a two-tiered case-by-case

2   approach.  *Adams*, 242 F.R.D. at 536 ; *see also Trinh*, 2008 WL 1860161, at *3; *Pfohl*, 2004

3   WL 554834, at *2.

4          "The first step under the two-tiered approach considers whether the proposed class

5   should be given notice of the action. This decision is based on the pleadings and affidavits

6   submitted by the parties. The court makes this determination under a fairly lenient standard

7   due to the limited amount of evidence before it." *Adams* at 536, citing *Leuthold v. Destination

8   America, Inc.*, 224 F.R.D. 462, 467 (N.D. Cal. 2004) .  Even at this stage the plaintiff must

9   provide sufficient evidence to support certification.  *See Silverman*,  2007 WL 6344674, at *2

10  (stating that "[a] standard requiring no more than mere allegations would render conditional

11  certification not only lenient but virtually automatic;" therefore, court "will require actual

12  evidence showing that there are a number of employees who are similarly situated and who

13  may desire to opt-in") (internal quotations omitted).

14         The more lenient first stage is typically used before much, if any, discovery has

15  occurred.  *See Wynn v. National Broadcasting Co., Inc.*, 234 F.Supp. 2d 1067, 1082 (C.D. Cal.

16  2002) (noting that first stage analysis is lenient "[d]ue to the minimal evidence at the court's

17  disposal").  This is not the situation in this case, where significant discovery has occurred.

18  Consequently, the Court should apply the stricter second-stage standard.  *See Pfohl*, 2004 WL

19  554834, at *3 (finding that where discovery relating to the issues of certification had occurred,

20  the court could proceed to the second stage of the analysis).[79]

21         At this second stage, the plaintiff's burden becomes considerably more demanding,

22  and courts examine various factors, including: (1) whether there are disparate factual and

23  employment settings among the individual plaintiffs; (2) the various defenses available to the

24  defendant which appear to be individual to each plaintiff; and (3) the fairness and procedural

25  considerations that would make certification improper.  *See Pfohl*, 2004 WL 554834, at *2;

26  _____
[79] See also *Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089-MJR, 2008 WL 2959932, at
27  *4 (S.D. Ill., Jul. 31, 2008) (applying second stage analysis and noting that where "[i]t is
clear that the parties have conducted a substantial amount of discovery," the court "cannot
28  close its eyes to the amount of discovery already performed").

1    *Basco*, 2004 WL 1497709, at *8.

2            As demonstrated, these factors militate against certifying a collective action.  A

3    number of vast factual differences will exist among individual class members in this proposed

4    nationwide class, and each plaintiff's claim will require individual consideration.  As a result,

5    Defendants' defenses will vary from plaintiff to plaintiff.  Resolving class members' claims

6    would require a series of mini-trials—and would hobble Defendants' ability to defend against

7    those claims.  Consequently, proceeding as a collective action is entirely inappropriate.

8            This case fails under either stage of the analysis, as Plaintiffs have failed to meet their

9    burden of showing: (1) that Defendants engaged in a nationwide scheme to deny overtime pay

10   to its employees; and (2) that they are similarly situated to the rest of the putative class.

11   **F.    Plaintiffs' Proposed Notice Contains Numerous Deficiencies And
12           Cannot Be Sent To Putative Class Members**

13           If the Court decides to conditionally certify a class, then Defendants respectfully

14   request that (1) the conditionally-certified action include only those AEs who were employed

15   in the same branches as Plaintiffs and Opt-Ins; and (2) the temporal scope of the notice be

16   limited to those AEs employed in the relevant branches within the two years prior to the

17   Court's order of any FLSA notice.

18           Courts often refuse to order notice to a nationwide or geographically-broad collective

19   class, especially where, as here, Plaintiffs have presented evidence from a limited number of

20   locations and states.  *Harper v. Lorett's Buffet Inc.*, 185 F.R.D. at 358, 413 (M.D. Ala. 1999)

21   (conditional certification limited to employees at single location where plaintiff failed to

22   provide evidence of corporate plan to violate wage and hour requirements at all locations);

23   *Williams*, 2006 WL 2085312 at *4.  Here, Plaintiffs propose sending notice to a nationwide

24   class of approximately 10,000 individuals even though they have presented evidence from

25   only eleven employees (some of which is inadmissible) who worked in only sixteen branches

26   out of approximately 1,450 branches nationwide. Plaintiffs' unsupported allegations of a

27   nationwide policy alone cannot justify nationwide notice.  *See Tucker v Labor Leasing, Inc.*,

28

---

OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION
LA1 6918922.2                                              Case No. C 08-04592 SC

1   872 F. Supp. 941, 949 (M.D. Fla. 1994).  Thus, notice, if warranted at all, should be sent only

2   to former employees of  those branches where Plaintiffs worked.

3          Further, the temporal scope of the notice is overbroad.  Plaintiffs propose sending the

4   notice to "ALL FORMER ACCOUNT EXECUTIVES… EMPLOYED BY HSBC… AT

5   ANY TIME FROM OCTOBER 2, 2005 THROUGH MARCH 31, 2009."  As Plaintiffs

6   concede, for any members of the proposed collective group, the statute of limitations

7   continues to run until they file written consents to join the collective action.[80]  Reaching back

8   three years prior to the filing of the complaint would mean that notice could be sent to

9   individuals whose claims are time-barred.  At most, notice should be sent to AEs employed

10   three years prior to the Court's ordering of any FLSA notice, not the filing of the complaint.

11          Further, because Plaintiffs do not provide any evidence that the alleged violations were

12   willful within the meaning of the statute, the notice period should reach back only two years

13   prior to the Court's ordering of any FLSA notice.  *See Cohen v. Allied Steel Buildings, Inc.*,

14   544 F.Supp 2d, 1331, 1335 (S.D. Fla 2008) (explaining that the plaintiff must establish facts

15   supporting a willful violation before sending notice based on a three-year statute of limitations

16   period); *Nunnery v. Groelle & Salmon, P.A.*, No. 8:06-cv-2099-T-30TBM, 2007 WL 781369

17   (M.D. Fla. Mar. 12, 2007) (same).  "Willful" means that the employer knew or showed

18   reckless disregard as to whether its conduct was prohibited by the FSLA.  *McLaughlin v.*

19   *Richard Shoe*, 486 U.S. 128 (1988).  Clearly, the facts here militate against any finding that

20   Defendants' conduct was willful.

21          There are numerous other deficiencies in the Notice, to which Defendants have filed

22   objections.  In sum, the notice: (1) does not adequately inform putative class members that

23   they may be responsible for costs should Defendants prevail.  *See e.g., Adams*, 242 F.R.D. at

24   540-41; (2) contains multiple instances of deceptive language; (3) provides for an

25   unreasonably long notice period; and (4) fails to protect the privacy rights of non-parties by

26   providing for a third-party administrator to distribute the notice.  Rather than burden the Court

27   _____

28   [80] Plaintiffs' Memo at 2.

24

1    at this stage with all of the deficiencies,  Defendants propose that if the Court conditionally

2    certifies a class, it allow a brief period for Defendants to propose a form of notice and confer

3    with Plaintiffs' counsel to narrow any disputes.

### CONCLUSION

5            Plaintiffs have not demonstrated to this Court that conditional certification is

6    appropriate.  They have been unable to identify for this Court a single illegal policy, decision

7    or plan that would render a class of AEs similarly situated to the Plaintiffs.  The evidence

8    Plaintiffs urge this Court to consider highlights the impracticality of granting their motion.

10   They have presented the Court with a suggested course of action that would result in an

11   unmanageable case devolving into numerous mini-trials with individual claims and defenses.

12   For the reasons set forth above, Defendants respectfully request that the Court deny plaintiffs'

13   motion for conditional certification and class wide notice under Section 216(b).

14   DATED: December 22, 2009                          SEYFARTH SHAW LLP

16                                                     By: _____/s/ Diana Tabacopoulos
                                                           DIANA TABACOPOULOS
17                                                     Attorneys for Defendants
                                                       HSBC FINANCE CORPORATION and
18                                                     BENEFICIAL COMPANY LLC

LA1 6918922.2