**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
PAUL VELASQUEZ, FAVIOLA ALVAREZ,   )   Case No. 08-4592 SC
MARCELO ALTAMIRANO, JACKEY WILSON  )
II, CARLOS MARTINEZ AND DIONICIO   )   ORDER DENYING MOTION
MARTINEZ, on behalf of themselves  )   FOR CONDITIONAL
and all others similarly situated, )   CERTIFICATION
                                   )
        Plaintiffs,                )
                                   )
    v.                             )
                                   )
HSBC FINANCE CORPORATION; HOUSEHOLD)
FINANCE CORPORATION; BENEFICIAL    )
COMPANY, LLC,                      )
                                   )
        Defendant.                 )
_____)
```

## I. **INTRODUCTION**

This matter comes before the Court on the Motion for (1) Conditional Certification; (2) Court-Authorized Notice; and (3) Production of Names and Addresses filed by Plaintiffs Marcelo Altamirano ("Altamirano") and Jackey Wilson II ("Wilson") (collectively "Plaintiffs"). Docket No. 75. Defendants HSBC Finance Corporation and Beneficial Company LLC (collectively "Defendants") filed an Opposition. Docket No. 94. Plaintiffs submitted a Reply. Docket No. 104. For the following reasons, the Court DENIES Plaintiffs' Motion.

## II. BACKGROUND

On November 18, 2008, Plaintiffs, on behalf of themselves and all others similarly situated, filed an Amended Complaint. Docket No. 22 ("Am. Compl."). It contains ten counts, including (1) failure to pay overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; (2) failure to pay the federal minimum wage in violation of the FLSA; (3) failure to pay the California minimum wage in violation of Cal. Code Regs. tit. 8, § 11000; and (4) failure to pay overtime compensation in violation of Cal. Code Regs. tit. 8, § 11040, and Cal. Labor Code § 510(a). Id. ¶¶ 58-82.

Plaintiffs are former Account Executives ("AEs"). AEs marketed and/or sold mortgages, insurance, home-equity loans, auto loans and/or other financial products and services. Id. ¶ 3; see also Biela Decl. Ex. A ("Maureen Gillan-Myer Dep.") at 22:9-24, Ex. G ("Account Executive Job Description").[1] Plaintiffs' proposed class period runs from October 2, 2005 through March 31, 2009. Docket No. 76 ("Mem. of P. & A") at 1. It runs until the end of March 2009, because Defendants' entire consumer lending branch network was closed at that time. Biela Decl. Ex. B ("Michael Robert Fitzpatrick") at 36:1-2.[2] During this period, Plaintiffs employed approximately 2100 AEs in California, and 8700

---

[1] Robert W. Biela, attorney for Plaintiffs, filed a Declaration in Support of the Motion for Conditional Certification. Docket No. 76-1. Maureen Gillan-Myer ("Gillan-Myer") is currently the Senior Vice President of Human Resources at HSBC.

[2] Michael Robert Fitzpatrick ("Fitzpatrick") is one of Defendants' 30(b)(6) corporate designees.

2

AEs outside of California.[3] Biela Decl. Ex. C ("Defs.' Resps. to Pls.' Interrogs.") at 17. Plaintiffs allege that they were required to work overtime hours "off-the-clock" in violation of the FLSA. Mem. of P. & A at 2. Plaintiffs seek to conditionally certify this case as a collective action so that notice can be sent to all putative members. Id.

### III. LEGAL STANDARD

The FLSA provides employees with a private right of action to sue an employer for violations of the Act on behalf of "themselves and other employees similarly situated." 29 U.S.C. § 216(b). The FLSA does not define "similarly situated," and the Ninth Circuit has not spoken to the issue. The Supreme Court, in Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989), left the term undefined.[4] However, the Supreme Court indicated that a proper collective action encourages judicial efficiency by addressing in a single proceeding claims of multiple plaintiffs who share "common issues of law and fact arising from the same alleged [prohibited] activity." Id.

A majority of courts, including district courts in the Ninth Circuit, have adopted an ad hoc, two-tiered, case-by-case approach for actions brought under the FLSA. See, e.g., Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102-03 (10th Cir. 2001); Hipp

---

[3] The number of California AEs is for the time period October 2, 2004 to March 31, 2009.

[4] Hoffmann-La Roche addressed a collective action brought under the Age Discrimination in Employment Act, which, the Court recognized, incorporates § 16(b) of the FLSA. 493 U.S. at 170.

3

v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1219 (11th Cir. 2001); Kress v. PricewaterhouseCoopers, LLP, --- F.R.D. ----, No. 08-0965, 2009 WL 4269465, at *3 (E.D. Cal. Nov. 25, 2009); Lewis v. Wells Fargo & Co., --- F. Supp. 2d ----, No. 08-2670, 2009 WL 3517660, at *2 (N.D. Cal. Oct. 26, 2009); Gerlach v. Wells Fargo & Co., No. 05-0585, 2006 WL 824652, at *2-3 (N.D. Cal. Mar. 28, 2006); Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004). Determining whether a collective action is appropriate is within the discretion of the district court. Leuthold, 224 F.R.D. at 466.

The first tier is the "notice stage," which asks whether the employees are sufficiently similarly situated such that notice should be sent to prospective plaintiffs giving them the opportunity to "opt in." See Kress, 2009 WL 4269465, at *3. "[T]he court requires little more than substantial allegations, supported by declarations or discovery, that 'putative class members were together the victims of a single decision, policy, or plan.'" Gerlach v. Wells Fargo & Co., No. 05-0585, 2006 WL 824652, at *2-3 (N.D. Cal. Mar. 28, 2006) (quoting Thiessen, 267 F.3d at 1102-03). The "notice stage" determination is made under a fairly lenient standard and typically results in conditional certification. Leuthold, 224 F.R.D. at 467. However, unsupported assertions of FLSA violations are not sufficient to meet Plaintiff's burden. Ellerd v. County of Los Angeles, No. 08-4289, 2009 WL 982077, *3 (C.D. Cal. Apr. 9, 2009) (quoting Edwards v. City of Long Beach, 467 F. Supp. 2d 986, 990 (C.D. Cal. 2006).

If a court grants conditional certification, then it engages

4

in a more searching review at the second stage when discovery is complete and the case is ready for trial. See Leuthold, 224 F.R.D. at 467. The second-tier analysis is generally triggered by a motion to decertify. Id.

**IV. DISCUSSION**

    **A. Evidentiary Objections and Motion to Strike**

In response to the evidence submitted in support of Plaintiffs' Motion for Conditional Certification, Defendants filed forty-six pages of evidentiary objections. Docket No. 97 ("Evidentiary Objections"). Many of these objections are entirely frivolous. For example, Defendants object to the authenticity and admissibility of their own responses to Plaintiffs' interrogatories, and to documents that they themselves produced in discovery. See Evidentiary Objections at 2, 7-12. Even taking Plaintiffs' submitted evidence into account, the Court finds that Plaintiffs are not entitled to have this case conditionally certified. Therefore, it is not necessary for the Court to issue rulings regarding Defendants' evidentiary objections.

Defendants also move to strike the deposition testimony of Paul Velasquez ("Velasquez"). See Docket No. 96 ("Mot. to Strike"). On July 15, 2009, Velasquez and Faviola Alvarez ("Alvarez") stipulated to the voluntary dismissal of their claims against Defendants with prejudice. Docket No. 52. Velasquez's employment with Defendants ended in February, 2005, Musolino Decl.

5

¶ 19, Ex. A. ("Velasquez Dep.") at 68:15-69:22,[5] which is more than three years before Plaintiffs filed their Complaint in this case on October 2, 2008. As such, Defendants contend his testimony is irrelevant and inadmissible. Mot. to Strike at 2-3. Defendants also contend that because his dismissal operated as an adjudication on the merits, Plaintiffs should not be able to use his testimony to support their position. Id. at 4.

Relevant evidence is evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The Court finds that Velasquez's testimony concerning his experiences as an AE is probative, although less probative than the testimony of AEs employed since October 2, 2005. Therefore, his testimony is admissible. Also, even though his dismissal operates as an adjudication on the merits, Plaintiffs can still rely on his testimony to corroborate the testimony and declarations of AEs who are putative members of this collective action. The Court DENIES Defendants' Motion to Strike Velasquez's testimony.

**B.   First-Tier Analysis Applies**

The Court begins by addressing Defendants' contention that the Court should apply the stricter second-tier analysis. Opp'n at 22. According to Defendants, significant discovery has occurred in this case. Id. Defendants have produced over 11,000 pages of documents, and taken eight depositions. Musolino Decl.

---

[5] Regina A. Musolino, a partner at Seyfarth Shaw LLP, filed a Declaration in Support of Defendants' Opposition. Docket No. 95.

6

¶ 35. According to Defendants, Plaintiffs have deposed four former District Sales Managers ("DSMs") and taken seven 30(b)(6) depositions. Id. According to Plaintiffs, only two 30(b)(6) depositions have been conducted. Reply at 4.

Even if seven 30(b)(6) depositions have occurred, it is clear that discovery is far from complete. The second-tier analysis usually occurs "[o]nce discovery is complete and the case is ready to be tried." Leuthold, 224 F.R.D. at 467. "Courts within this circuit refuse to depart from the notice stage analysis prior to the close of discovery." Kress, 2009 WL 4269465, at *4. This Court follows the majority of district courts within this Circuit and applies the first-tier, or notice stage, analysis.

### C. **Plaintiffs Have Not Shown They Are Similarly Situated**

When plaintiffs allege that employers have violated the FLSA by failing to pay overtime compensation, the case is typically either a "misclassification" case, where the allegation is that the employer improperly classified the employee as exempt from overtime compensation, or an "off-the-clock" case, where the allegation is that the employer failed to pay overtime compensation to non-exempt, hourly, employees. In misclassification cases, it is often easier to show the plaintiffs were the victims of a single decision, policy, or plan. Compare Kress, 2009 WL 4269465, at *6 ("Taken literally, this [notice stage] standard might allow plaintiffs to receive conditional certification solely on the basis . . . [of] an employer's uniform classification decision.") with Castle v. Wells Fargo Fin., Inc., No. 06-4347, 2008 WL 495705, at *2-5 (N.D. Cal. Feb. 20, 2008)

(denying conditional certification where plaintiffs alleged they had been denied overtime pay for "off-the-clock" hours worked under variety of different circumstances, and where plaintiffs failed to identify company-wide policy or practice).

This case is an "off-the-clock" case. See Mem. of P. & A. at 2. From 2004 through 2009, AEs were classified as non-exempt employees. Gillan-Myer Dep. at 17:20-22. Plaintiffs' motion for conditional certification relies upon two theories. First, they allege that Defendants set sales targets for AEs that required AEs to work off-the-clock so as to meet those targets. Mem. of P. & A. at 5-8. Second, Plaintiffs allege that branch managers, district managers, and regional managers were "incentivized" to control overtime expenses such that AEs had to work off-the-clock. Id. at 8-14. According to Plaintiffs, they have "submitted declarations and testimony from putative Class members and former Account Executives who attest to being victims of Defendants' unwritten policies and practices which required the employees to meet mandatory sales targets while keeping overtime expenses to an unrealistic minimum." Reply at 9. The Court addresses each theory in turn.

**1. Sales Targets**

The evidence submitted to the Court indicates that Defendants set "new money goals" which were performance targets for AEs and branch managers. Biela Decl. Ex. F ("Barden Dep.") at 18:15-22,[6] Ex. S ("2007 Compensation Plan"), Ex. T ("2008 Incentive

---

[6] Jeffrey Scott Barden ("Barden") is one of Defendants' 30(b)(6) corporate designees. See Mot. at 10-11.

8

Compensation Plan"). According to Barden:

> New Money is the incremental amount of new dollars that come into the business from originating a loan, so depending on what part of the country that you're in, what's the average loan size for that part of the country, and based on the unit production expected of that part of the country , you would be assigned a New Money goal . . . . Each branch went through an evaluation process, depending on, you know, where they were, what their history had been, what was going on in their economic environment to determine what their opportunity was which plugged directly into the New Money goal.

Barden Dep. at 18:23-19:17. By the end of 2008, Defendants had approximately 800 branches operating in about 80 districts. Fitzpatrick Dep. at 31:21-32:4. Barden's testimony indicates that the sales targets of AEs differed depending on the location, and changed over time, which undercuts the inference that these targets were the basis of a common policy or practice which forced AEs throughout the country to work overtime without compensation. Determining which sales targets required which AEs to work overtime without compensation would require individualized determinations.

According to Plaintiffs, these performance targets forced AEs to work overtime hours without compensation in order to preserve their jobs. Mem. of P. & A. at 7. In support of this contention, Plaintiffs rely on the deposition testimony of five former AEs, and the declarations of six former AEs. In the declarations submitted by Plaintiffs, six former AEs state that they were required to meet a "pre-determined sales quota" each month, and that they regularly had to work more than forty hours without compensation in order to meet these sales quotas. Biela Decl. Ex.

9

M ("Carney Decl.") ¶¶ 3-4, Ex. N ("Carson Decl.") ¶¶ 3-4, Ex. O ("Griffiths Decl.") ¶¶ 3-4, Ex. P ("Klingensmith Decl.") ¶¶ 3-4, Ex. Q ("Martin Decl.") ¶¶ 3-4, Ex. R ("Walters Decl.") ¶¶ 3-4.

In response, Defendants have submitted eighty-three declarations from employees, most of whom are Branch Sales Managers ("BSMs"), and all of whom claim they never required AEs to work off-the-clock. See App. of Evidence in Support of Defs.' Opp'n Ex. P ("Decls. in Support of Opp'n"). Approximately nineteen of these employees served as AEs, or Senior Account Executives ("SAEs"), and they claim that when employed in those positions they did not work off-the-clock. See Decls. in Support of Opp'n. While Plaintiffs question the validity and accuracy of these declarations, see Reply at 4 n.5, they suggest the experiences of Carney, Carson, Griffiths, Klingensmith, Martin, and Walters were not the result of a company-wide policy or plan.

Plaintiffs also rely on the deposition testimony of five former AEs. According to the testimony of Velasquez, his branch manager never told him to work outside of office hours, but "insinuated" that he should generate his own sales leads outside of work. Biela Decl. Ex. K ("Velasquez Dep.") at 43:7-44:22. Velasquez did not notify his branch manager that he was generating leads after office hours. Id. at 44:23-45:1. According to Velasquez, he worked late two nights a week, and if he was not making his goals, he had to extend that to an extra night. Id. at 86:12-18. He testified that branch managers would cut back his requested hours if the district manager sent out emails saying no overtime was allowed. Id. at 92:8-25.

10

According to Alvarez, she worked after she had clocked out approximately three or four times. Biela Decl. Ex. L ("Alvarez Dep.") at 39:1-11. In response to a question about whether anyone told her she had to continue to work after she had clocked out, she responded: "I want to say they didn't give me that impression, but I had to continue to work. . . . I couldn't leave . . . things unfinished . . . ." Id. at 39:23-40:3. Alvarez told managers twice that she had work to finish after she clocked out, and they responded that it didn't matter. Id. at 40:4-16.

David Almazan ("Almazan") worked in the Cerritos and Buena Park branches of HSBC. Biela Decl. Ex. J ("Almazan Dep.") at 51:15, 75:6-10. Almazan testified that not everyone worked outside of their scheduled hours, id. at 73:20, but for those who did "there was an unwritten rule or kind of understanding that if you had too much overtime for one reason or another that you showed up on the company radar." Id. at 74:6-9, 158:10-14. Almazan acquired this understanding from his colleagues, not from management. Id. at 74:14-18. Almazan sometimes had to use his cell phone outside of work to call a customer, he sometimes had to stay late at the end of the month to complete a loan deal, and once or twice a month he worked weekends without recording his time. Id. at 78:2-19. Almazan testified that, although he does not recall specific conversations, branch sales managers and district sales managers "conveyed" to AEs that it was frowned upon to have too much overtime. Id. at 155:3-25. He testified that if he was still on the phone with a customer at 7:00 p.m., he had to continue the phone call "because that's how I made my living was

11

by booking loans. I mean, I had to do what I had to do to get the job done. If it was five minutes later, 30 minutes later. I mean, ultimately my hourly [pay] was measly compared to the bonus that was potentially made, so you did what had to be done." Id. at 158:20-159:5. He does not recall any branch manager specifically having an issue with the amount of overtime he was recording. Id. at 159:7-12.

Marcelo Altamirano ("Altamirano") worked as an AE at the Fullerton branch. Biela Decl. Ex. H ("Altamirano Dep.") at 78:1-6. Altamirano recalls being told by a supervisor that AEs were not supposed to work overtime, and that he was working too much overtime. Id. at 100:17-19, 103:8-25. He does not recall anyone specifically telling him not to record the time he spent working for the company. Id. at 110:11-15. Altamirano was required to have a minimum number of deals in order to continue his employment, and he states that "I had to do what I had to do to generate the business," but he does not recall ever telling anyone at HSBC that he was required to work off-the-clock to generate enough business to stay employed. Id. at 111:1-22. He recalls that there were times when AEs in his branch had to work Saturdays or overtime in order to meet the sales goals set for the area or the branch. Id. at 118:17-25. Jackey Wilson II ("Wilson") worked at the Brea and Cerritos branch. Biela Decl. Ex. I ("Wilson Dep.") at 29:10, 75:13. He testified that at the end of the month, AEs had to stay late to close loans, and that branch

managers were present.[7] Id. at 183:21-25, 185:3-7. Wilson testified that he was paid his regular wages when he should have been paid time-and-a-half on approximately five occasions. App. of Evidence in Support of Opp'n Ex. D ("Wilson Dep.") at 101:14-102:20.

There are a number of aspects of this deposition testimony that undermine its value in showing that Plaintiffs were the victims of a common policy or plan. As noted above, Velasquez's testimony has less probative value because he was no longer employed by Defendants during the time period that would apply to this putative collective action. See Part IV(A), supra. According to Alvarez, she worked off-the-clock only about three or four times, and Wilson worked off-the-clock approximately five times. Almazan's testimony suggests he worked off-the-clock for the sake of trying to acquire bonuses, rather than in a effort to meet mandatory sales quotas. Putting all this evidence together, the Court finds Plaintiffs have not met their light burden of showing they were the victims of a single decision, policy, or plan whereby sales targets were set so high that AEs were required to work overtime without compensation.

In an effort to portray AEs' sales targets as strict sales requirements, Plaintiffs also rely on a Performance Improvement Plan issued to Almazan indicating an "[i]nability to perform" during November and December 2006. Biela Decl. Ex U.

---

[7] Although Plaintiffs' Memorandum quotes from Wilson's deposition, Mem. of P.& A. at 7, the page containing the quotation is not included in the exhibits Plaintiffs filed with the Court.

13

("Performance Improvement Plan"). However, in his deposition, Almazan explained this performance review as due to the fact that he had just returned from an eight-to-ten week leave of absence. App. of Evidence in Support of Defs.' Opp'n ("Almazan Dep.") at 151:2-21. Almazan did not explain the poor review as due to the fact his sales targets were too high, and he explicitly testified that he was never told by a branch manager or district sales manager not to record all of his time. Id. at 156:2-7.

The evidence submitted by Plaintiffs does not show that Plaintiffs were sufficiently similarly situated such that the Court should authorize that notice be sent to approximately 10,000 former AEs around the country. Instead, this evidence from eleven former AEs indicates that they may have individual FLSA claims against Defendants. There is not enough evidence of a company-wide policy that required AEs to meet "mandatory sales targets while keeping overtime expenses to an unrealistic minimum." Reply at 9.

### 2. Management Incentives

Plaintiffs' second basis for alleging they were similarly situated relies on management incentives to control overtime. Mot. at 9-11. Plaintiffs allege that branch managers, district managers, and regional managers were "incentivized" to control overtime expenses such that AEs regularly had to work off-the-clock. Id. at 9. The management hierarchy consisted of branch sales managers ("BSMs"), district sales managers ("DSMs"), divisional general managers ("DGMs"), and two regional general managers ("RGMs"). Fitzpatrick Dep. at 47:15-50:2. AEs were

14

required to obtain approval from their BSMs before working overtime. Gillan-Myer Dep. at 38:11-24.

The Court begins by noting that Plaintiffs provide no evidence showing that the immediate supervisors of AEs, the BSMs, received bonuses tied to overtime expenses. Instead, Plaintiffs present evidence showing that DSMs could receive a small bonus based, in part, on controlling the amount of overtime within the district. Barden Dep. at 51:5-20; Biela Decl. Ex. T ("2008 Incentive Compensation Plan") at HSBC0001970, Fitzpatrick Dep. at 75:10-17. Plaintiffs also point out that RGMs were eligible for a large bonus based on a number of business metrics including "profit measures, employee engagement results, insurance results, loan account growth, productivity, expenses and employee recruitment development." Gillan-Myer Dep. at 104:21-106:3.

Based on this evidence, Plaintiffs want the Court to conclude that AEs were subjected to a common policy or practice requiring them to work overtime without compensation. The evidence regarding bonuses for district and regional managers is simply insufficient for the Court to conclude that management was "incentivized" on a company-wide basis to deny AEs overtime compensation. While the declarations and deposition testimony of former AEs submitted by Plaintiffs show that there were occasions when AEs worked overtime without compensation, the evidence regarding management bonuses is too tenuous to suggest that these instances were the result of a common, company-wide policy or plan.

Many of the Plaintiffs in this case acknowledged that there

15

were occasions when they were paid overtime compensation. See
App. of Evidence in Support of Defs.' Opp'n Ex. B ("Alvarez Dep.")
at 55:11-15 (Alvarez thinks he was paid overtime at HSBC), Ex. C.
("Altamirano Dep.") at 105:11-13, Ex. E ("Almazon Dep.") at 157:4-
11, Ex. F ("Walters Dep.") at 87:15-89:15, Ex. G ("Carney Dep.")
at 68:18-24, Ex. H ("Klingensmith Dep.") at 42:2-7. This evidence
weakens the allegation that management was incentivized to deny
overtime compensation.

Finally, Plaintiffs present evidence that Defendants' Human Resources Department investigated complaints by AEs that management was requiring them to work off-the-clock. Mem. of P.& A. at 13; Biela Decl. Exs. AA, BB, DD, EE, and FF. To the extent that management knew it could be subject to such an investigation, this evidence also weakens Plaintiffs' allegations regarding management incentives to deny overtime compensation.

**D. Other Cases**

In support of their motion for conditional certification, Plaintiffs rely on this Court's rulings in other cases. These cases are distinguishable. In Beauperthuy v. 24 Hour Fitness USA, Inc., this Court conditionally certified a class of personal trainers who alleged they were required to work overtime without compensation. No. 06-0715, 2008 WL 793838, at *1 (N.D. Cal. Mar. 24, 2008). In that case, the trainers alleged that their payroll system set strict quotas on the number of floor time hours each employee could record so that the total hours per week never exceeded forty. Id. at *3. Here, the allegations of a common policy or plan are less clear, based on sales targets and

16

management incentives. Unlike the plaintiffs in Beauperthuy, many of the Plaintiffs in this case were sometimes paid overtime compensation. See Part IV(C)(2), supra. Furthermore, in Beauperthuy, the defendants did not offer a single declaration from a 24 Hour Fitness employee stating that the company followed its written rules, or otherwise contradicting the trainers' declarations. Id. at *4. Here, Defendants have presented eighty-three declarations from their employees in support of their opposition. See Part IV(C)(1), supra.

Plaintiffs also rely on this Court's decision in Gilbert v. Citigroup, Inc., No. 08-0385, 2009 WL 424320 (N.D. Cal. 2009). In that case, there were allegations that employees were both misclassified as exempt, and they were required to work off-the-clock after they had been reclassified as non-exempt employees. Id. at *1. Based on Citigroup's decision to reclassify the plaintiffs, the Court found there were sufficient allegations of a common policy or plan to warrant conditional certification. Id. at *2-3. In this case, the evidence presented to the Court does not support the inference that Plaintiffs who worked overtime without compensation were the victims of a single decision, policy, or plan. The Court finds no inconsistency between its prior decisions in Beauperthuy and Gilbert, and its current determination that conditional certification is not warranted.

Finally, the Court notes that it should not consider the merits of Plaintiffs' claims at the conditional certification stage. Madden v. Corinthian Colleges, Inc., No. 08-6623, 2009 WL 4757269 (N.D. Ill. Dec. 8, 2009) at *3; Mowdy v. Beneto Bulk

17

Transp., No. 06-5682, 2008 WL 901546, at *6 (N.D. Cal. Mar. 31, 2008); Centurioni v. City and County of San Francisco, 2008 WL 295096, at *2 (N.D. Cal. Feb. 1, 2008). Here, the Court has not considered the merits of Plaintiffs' claims that they were required to work overtime without compensation in violation of the FLSA. Instead, the Court has focused almost exclusively on the evidence submitted by Plaintiffs in support of their Motion for Conditional Certification. Based on the evidence submitted concerning the experiences of former AEs, and based on the sparse evidence submitted to support Plaintiffs' contentions relating to sales targets and management incentives, it is simply too much of a stretch for the Court to conclude that approximately 10,000 former AEs were the victims of a single decision, policy or plan to deprive them of overtime compensation. See Thompson v. Speedway SuperAmerica LLC, No. 08-1107, 2009 WL 130069, at *2, *8, *13 (D. Minn. Jan. 20, 2009) (denying conditional certification in case where there was a "dearth of evidence" to support allegations that FLSA violations resulted from a common policy or plan); Simmons v. T-Mobile USA, Inc., No. 06-1820, 2007 WL 210008, at *6 (S.D. Tex. Jan. 24, 2007) (denying conditional certification in case where sales staff were required to meet minimum monthly sales quotas and where T-Mobile discouraged supervisors from authorizing sales people to work overtime). The Court finds that Plaintiffs have not succeeded in making a minimal showing that the members of this proposed collective action are similarly situated.

///

///

18

## V. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Conditional Certification is DENIED. The Court DENIES Plaintiffs' request for Court-Authorized Notice, and the Court DENIES Plaintiffs' request for the production of names and addresses.

IT IS SO ORDERED.

Dated: February 18, 2010    
                            UNITED STATES DISTRICT JUDGE